**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-2031**

---

SYLIVIA SMITH-PHIFER; LANCE PATTERSON,

　　　　　Plaintiffs - Appellees,

　　v.

CITY OF CHARLOTTE,

　　　　　Defendant - Appellant.

---

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:18-cv-00612-RJC-SCR)

---

Argued:  May 8, 2024　　　　　　　　　　Decided:  September 25, 2024

---

Before KING and RICHARDSON, Circuit Judges, and Gina M. GROH, United States District Judge for the Northern District of West Virginia, sitting by designation.

---

Vacated in part, affirmed in part, and remanded by published opinion.  Judge Richardson wrote the opinion, in which Judges King and Groh joined.

---

**ARGUED:** Tory Ian Summey, PARKER POE ADAMS & BERNSTEIN, LLP, Charlotte, North Carolina, for Appellant.  Edward Theodore Hinson, Jr., JAMES, MCELROY & DIEHL, PA, Charlotte, North Carolina, for Appellees.  **ON BRIEF:** Jeremy Daniel Locklear, PARKER POE ADAMS & BERNSTEIN LLP, Raleigh, North Carolina, for Appellant.  Margaret Behringer Maloney, Mitchell Gene Davis, MALONEY LAW & ASSOCIATES, Charlotte, North Carolina, for Appellees.

RICHARDSON, Circuit Judge:

The City of Charlotte, North Carolina, appeals from the district court's order summarily granting Sylivia Smith-Phifer and Lance Patterson's motions to enforce their settlement agreements. The City argues that the district court erred in ordering the City to treat its settlement payments to Smith-Phifer and Patterson as eligible for pension benefits under the Charlotte Firefighters Retirement Systems Act.

We vacate in part and affirm in part. As to Patterson, the district court erred because it couldn't rule on Patterson's motion without first holding an evidentiary hearing on whether Patterson and the City ever reached a complete agreement. But as to Smith-Phifer, the parties did reach a valid written settlement agreement. Their dispute about that agreement comes down to whether the agreement required the City to make a retirement deduction from its payment. We hold that the City was required to make the deduction. So because the City did not, the district court correctly concluded that the City breached the agreement.

## I.    Background

Smith-Phifer and Patterson served with the Charlotte Fire Department for over twenty years. But, according to them, their decades-long service wasn't smooth sailing. They alleged that Fire Department discriminated against them because they are Black. As a result, they jointly sued the City in a four-count complaint for violations of Title VII, 42 U.S.C. §§ 1981 & 1983, and Article I of the North Carolina Constitution.[1]

---

[1] Smith-Phifer and Patterson originally brought their claim in North Carolina state court, but the City removed to federal court.

2

A jury trial on Plaintiffs' claims was set for November 7, 2022. But Patterson got sick, and the district court granted him a continuance. So Smith-Phifer proceeded to trial alone, and the pair's litigation paths diverged.

## A.    Smith-Phifer

On November 15, 2022—a week into Smith-Phifer's case-in-chief—Smith-Phifer and the City told the district court that they had reached a settlement. So the district court dismissed the jury and ordered Smith-Phifer to dismiss her claims when she received her settlement payment or within 30 days, whichever came sooner.

The same day, the parties signed a General Release and Settlement Agreement ("General Release"). That agreement contained only the first part of their final settlement agreement, because Smith-Phifer asked to work one last shift on November 18. The parties agreed that they'd later execute another agreement to cover any claims that arose between November 15 and the end of Smith-Phifer's final shift. That second agreement became the Supplemental Release and Settlement Agreement ("Supplemental Release") that Smith-Phifer and the City signed on November 19, 2022. Together, the releases form the agreement.

Start with what terms the two releases share. Both state that the City "denies that it is any way liable to Smith-Phifer" and that Smith-Phifer acknowledges that neither the agreement nor the consideration was an admission of "wrongdoing." J.A. 211, 216, 218, 222. Each also contains a merger clause stating that the agreement "sets forth the entire agreement between the Parties . . . and fully supersedes any prior agreements or understandings between the Parties." J.A. 216, 223.

3

Now for the terms specific to each release.  The General Release states that, as consideration for Smith-Phifer's retirement and her "release[] and forever discharge[] . . . of and from any and all claims, known and unknown . . . as of the date of execution of" the General Release, the City will pay $50,000 in a "check made payable to Maloney Law & Associates."[2]  J.A. 212–13.  The payment "is not payment for wages, and as a result, will not be subject to normal withholdings and deductions, and will be reported on an IRS Form 1099 to Smith-Phifer and Maloney Law & Associates."  J.A. 212.  The General Release also specifies that the City would restore 400 hours of sick time that Smith-Phifer took in 2022.

The Supplemental Release picks up from there.  It states that Smith-Phifer will release any claims as of the date of that agreement (embracing any claims arising during her last shift) and that she will retire.  As for the City, the Release states that it will pay the gross amount of $250,000 in two payments.  The first—another payment to Maloney Law for $176,829.94—was, like the payment in the General Release, "not payment for wages . . . and will be reported on an IRS Form 1099."  J.A. 219.  The remaining $73,170.06 payment is central to this appeal.  For that payment, Term 1(b) requires that the City must issue:  "One (1) check made payable to 'Sylivia Smith-Phifer' in the amount of . . . ($73,170.06), minus all applicable deductions for which the City of Charlotte will issue Smith-Phifer a tax form W-2."  *Id.*

---

[2] Maloney Law is the firm that represented both Smith-Phifer and Patterson.

Once the two releases were signed, the parties began performance. Neither party raises any dispute about the two checks the City made payable to Maloney Law; the dispute is solely over the check made payable to Smith-Phifer under Term 1(b). Pursuant to that term, on December 9, 2022, the City issued Smith-Phifer a check for $26,768.68, which the check described as "Earnings" for "Severance Pay." J.A. 225. To arrive at that amount, the check indicates that the City began with the agreed-upon $73,170.06 and then deducted $11,401.38 in taxes and $35,000 for some before-tax deduction labeled "457 VO2."[3] *Id.* Yet the City did not deduct anything for the Retirement Plan. As we will see, the City's failure to make that deduction didn't sit well with Smith-Phifer, so she refused to accept the check. But first, let's get back to Patterson.

## B.      Patterson

Patterson's story has more twists and turns than Smith-Phifer's. In November 2022, his case was sent to mediation. What followed was an email rally. The back-and-forth started on November 23, 2022, when the mediator sent the parties' lawyers an email stating: "I believe we have an agreement to settle." J.A. 139. As for what that settlement entailed, the email identifies only two things: (1) "$180,000, of which $79,000 is paid to Patterson through payroll and $101,000 is paid to Maloney Law," and (2) "Patterson is provided 2,200 hours sick leave to bridge him to 25 years for retirement." *Id.*[4] The email then asked the parties to "reply-all to confirm this agreement." *Id.*

---

[3] The parties do not identify the nature of the $35,000 pretax deduction.

[4] Some sources in the Joint Appendix that we quote throughout this opinion do not use commas in numbers above 1,000. So we add missing commas for clarity.

5

Later that night, the City's outside counsel, Kathleen Lucchesi, responded that the City would like to add a term requiring Patterson to retire "immediately upon his execution of the settlement agreement." J.A. 296. Apart from that addition, Lucchesi said that she would "put these terms in the same (or very similar given the differing terms) agreement [they] used for [Smith-]Phifer . . . and send it over . . . if [she] c[ould] get approval from the City." *Id.*

Maloney Law at first replied that it would watch for Lucchesi's later email. But then, only ten minutes later, Maloney Law sent another email seeking "to confirm" that Patterson "want[ed] 522 hours sick leave paid out to him" and "[t]he remaining balance . . . to bridge him to 25 years." J.A. 294. Lucchesi responded that she'd send Patterson's request to the City "for confirmation." *Id.*

Three days later, the parties filed an amended status report with the district court. It stated that they "ha[d] agreed to settlement terms and [we]re preparing a final settlement agreement to be fully executed." J.A. 126.

That execution never occurred because the parties reached an impasse. One source of the conflict was Patterson's November 26 visit to the office of the Charlotte Firefighters Retirement System, which manages Charlotte firefighters' retirement plan. There, Patterson asked Sandra Thiry, the Retirement System's Administrator, for an estimate of his retirement benefits considering the fact "he would be receiving an additional $79,000 in pension-eligible compensation." J.A 298. Thiry didn't confirm with the City whether what Patterson said was true. Instead, she took Patterson's word and calculated the monthly pension estimate based on an additional $79,000 in pension-eligible earnings.

6

Lucchesi included this estimate in an email she sent to Maloney Law on November 30. She also attached a draft settlement agreement that the City had approved. But it was the two points Lucchesi put in the body of the email that ignited the parties' disputes. The first point stated that, "[i]n order to bridge Chief Patterson to 25 years of service, the City needs to frontload him with 1,375 hours of sick leave," rather than the previously discussed 2,200. J.A. 312. That was because, at the time of "the pre-trial settlement offer of $180,000," Patterson had needed 2,200 hours to get him to the twenty-five years of service requisite for retirement. *Id.* Yet, since that offer, Patterson had continued to work for two months. He thus no longer "require[d] as many frontloaded sick leave hours to reach 25 years of service." *Id.*

The second point was where Lucchesi invoked Thiry's retirement-benefit estimate. To assuage concerns about the decreased sick-leave hours, Lucchesi noted that "the City will pay [Patterson] $79,000 in wages as part of this settlement, [so] his retirement benefit will increase beyond what the frontloaded sick leave provides—going from about $7,100 per month to nearly $9,300 per month." *Id.* This was the first mention of retirement benefits in any of the settlement discussions (including with Smith-Phifer).

The conversation deteriorated from there. On December 1, Maloney Law rejected the draft agreement as sent, explaining that "Patterson agreed to 2,200 hours and the City needs to provide that to him per the previous Agreement." J.A. 311. When the City attempted to discuss the sick-leave issue, Maloney Law held its ground and demanded 2,200 hours. But the City stood steady, too, asserting that Patterson no longer needed that many hours to reach twenty-five years of service. It also retracted its prior statement about

7

retirement benefits. It explained that it "learned that Chief Patterson told Sandy Thiry that he was receiving $79,000 in wages and [that she] understood from Chief Patterson that these were pensionable wages." *Id*. But the City's Human Resources Director later clarified that "the $79,000 is not pensionable so with the 1,375 sick hours, [Patterson's] retirement benefit will be $7,100 per month." J.A. 310. Maloney Law disputed that point just as strongly—"Patterson accepted the City's settlement offer with the understanding that $79,000 would be paid through payroll . . . and as such, those wages are pensionable." J.A. 309.

After more back-and-forth on both sick-leave hours and pension eligibility, the parties' rally ended when the City sent another draft settlement agreement and Patterson again refused to sign it.

### C.    Motions for Enforcement of Settlement Agreements

Plaintiffs' stories reconverge with the two motions that led to this appeal. Each motion sought to have the district court enforce the purported terms of the purported settlement agreements. And each motion rested much of its argument on the Charlotte Firefighters Retirement System Act. So, before getting to the motions themselves, we review the statute that the motions put at issue.

### 1.    Charlotte Firefighters Retirement System Act

The Charlotte Firefighters Retirement Systems Act was originally passed by the North Carolina General Assembly in 1947 to provide retirement and disability benefits for the uniformed employees of the Charlotte Fire Department. Act of Apr. 5, 1947, ch. 926,

8

§ 3, 1947 N.C. Sess. Laws 1303, 1303.[5]  To accomplish this objective, the Act created the Charlotte Firefighters Retirement System.  *See id.* § 1.  That entity—which administers the retirement fund and pays outs benefits upon members' retirement—is distinct from the City and is overseen by a Board of Trustees.  *See* Act of Apr. 16, 2001, No. 22, sec. 1, § 27–41, 2001 N.C. Sess. Laws 35, 52–57; Oral Arg. 1:56–2:07.[6]

The Act also establishes that the Retirement System is financed by contributions that both members and the City must pay into the pension fund.  Members' contributions come out of their paychecks, so the City must "deduct[] from each and every payroll of [a] Member, an amount equal to the Member's Compensation multiplied by . . . twelve and sixty-five hundredths percent (12.65%)."  Act of Apr. 16, 2001, No. 22, sec. 1, § 24, 2001 N.C. Sess. Laws at 51. Then, the City must match that amount—that is, contribute a corresponding 12.65% of "the Member's Compensation"—from its own coffers.  *Id.* § 25, 2001 N.C. Sess. Laws at 51.

The Retirement System then uses these funds to pay each member a monthly benefit upon his retirement.  Those benefits, however, are not directly linked to a member's contributions.  Instead, the Act requires the Retirement System to calculate the benefit amount based on the member's "Final Average Salary."  *Id.* § 17(a), 2001 N.C. Sess. Laws

---

[5] The Act has been amended several times, most significantly in 1992, when the General Assembly passed "an act to rewrite the law regarding the Charlotte Firefighters' Retirement System."  Act of July 2, 1992, ch. 830, 1992 N.C. Sess. Laws 289, 289.  The general structure of the Act as it exists still resembles that law.

[6] The Act, though valid and effective legislation, is not codified in the General Statutes of North Carolina.  Instead, the Act remains in scattered pieces strewn throughout the North Carolina Session Laws.

9

at 44–45. That salary, in turn, is based on his "Compensation." Act of June 28, 2017, No. 71, sec. 1, § 2(11), 2017 N.C. Sess. Laws 683, 683.

Thus, the member's contribution, the City's contribution, and the member's eventual benefits all depend on the member's "Compensation," which the Act defines as:

> the remuneration reportable on Form W-2 earned by a Member for services performed as an employee of the Charlotte Fire Department prior to any reductions pursuant to [certain sections] of the Internal Revenue Code. Compensation shall include payments for unused sick and vacation days, longevity payments, bonus payments, and merit increases.

Act of July 13, 2006, No. 117, sec. 1, § 2(9), 2006 N.C. Sess. Laws 440, 440.[7] The Act doesn't further define these definitional terms.

When administering the Act, the Board has specific duties as well as broad discretion. As relevant here, this includes (1) the duty to "correct" any "error" in its records

---

[7] Below, the parties debated whether the applicable definition for "Compensation" comes from a session law passed by the General Assembly in 1995 or from a session law passed in 2017. This debate largely stems from confusion over how session laws operate. The General Assembly most recently amended the Act in 2017, but it did not repeal all prior versions and reenact the Act. The 2017 session law instead made a targeted amendment to the provision defining "Final Average Salary." *See* Act of June 28, 2017, No. 71, sec. 1, § 2(11), 2017 N.C. Sess. Laws at 683. It did not alter the provision defining "Compensation." *See id.* So the 2017 session law does not bear on the definition of "Compensation." But neither does the 1995 session law—which was the last law amending the Act passed before Smith-Phifer's retirement benefits purportedly vested in 1997— amend the definition of "Compensation." *See* Act of June 5, 1995, ch. 171, 1995 N.C. Sess. Laws 318, 318. It appears that we must choose between the definition of "Compensation" included in a 1992 session law (the law defining "Compensation" in force when Smith-Phifer's benefits purportedly vested), *see* Act of July 2, 1992, ch. 830, sec. 1, § 2(9), 1992 N.C. Sess. Laws at 289, and the definition of "Compensation" included in a 2006 session law (the law defining "Compensation" in force today), *see* Act of July 13, 2006, No. 117, sec. 1, § 2(9), 2006 N.C. Sess. Laws at 440. But the parties do not identify how the differences between the two definitions would impact this case's disposition. So, for simplicity's sake, we cite only to the 2006 definition for "Compensation"—which, having never been amended or repealed, remains in effect today.

that "result[s] in any person receiving . . . more or less than he would have been entitled to receive had the records been correct," and "adjust[ing] the payment" to the person accordingly, Act of Apr. 16, 2001, No. 22, sec. 1, § 54, 2001 N.C. Sess. Laws at 63; and (2) the "discretion" to "adjust[]" "[t]he retirement benefits payable to a Retiree . . . based upon the prevailing economic and funding conditions," although the adjustment must be ratified by the City, *id.* § 23(a), 2001 N.C. Sess. Laws at 50.

Now that we've laid out the basics of the Act, we can return to the motions that refer to it.

### 2.    Patterson's Motion

Patterson's motion came first—on December 7, 2022, the day after the City sent the last draft settlement agreement. Though he refused to sign that draft, Patterson argued that he and the City had already reached a complete, enforceable agreement as shown by the mediator's November 23 email. He also argued that the terms of the agreement required the City to classify the $79,000 as pension-eligible wages because (1) the mediator's email stated the amount would be paid "through payroll," (2) the City's draft settlement agreements said that the amount would be "wages," and (3) wages are encompassed in the Act's definition of compensation. So Patterson requested that the district court enforce the City's agreement to pay Patterson $79,000 "through payroll as 'wages.'" J.A. 138.

The City countered that there was no settlement agreement to enforce. While recognizing that the parties reached tentative settlement terms via the mediator, the City argued that they failed to reach a final agreement because there was no meeting of the minds on sick leave or pension eligibility and because the parties understood that the

11

agreement would only be final when written and executed. According to the City, its factual dispute with Patterson about the existence of an agreement meant that the district court could "not 'summarily enforce the settlement agreement' and must instead[] conduct a plenary hearing and make findings on the issues in dispute." J.A. 285 (quoting *Hensley v. Alcon Lab'ys, Inc.*, 277 F.3d 535, 541 (4th Cir. 2002)).

### 3.    Smith-Phifer's Motion

Smith-Phifer filed her motion two weeks later (eleven days after the City tendered a check to her). That motion argued that the City breached the settlement agreement "when it issued Smith-Phifer's payroll payment coded as 'severance' and not as pensionable wages in its payroll system and when it failed to make all applicable deductions," including a deduction for the retirement plan. J.A. 209. According to Smith-Phifer, the settlement agreement requires that the City classify its payment to her as pension-eligible wages, not severance, since both releases state that the payments to Maloney Law were "not payment for wages," whereas Term 1(b) lacks that qualifier. J.A. 207–08. This is bolstered, in her view, since Term 1(b) requires the City to "issue Smith-Phifer a tax W-2," a form used "to describe an employee's wages." J.A. 208. Smith-Phifer then argued that wages are "Compensation" under the Act, meaning the 12.65% retirement-plan deduction was an "applicable deduction" that the City had to, but did not, deduct. So she asked the district

12

court to "enforce the terms of the settlement agreement" by requiring "the City [to] issue a corrected payment . . . to Plaintiff through payroll as pensionable 'wages.'" J.A. 210.[8]

In opposition to this motion, the City argued that the agreement does not require the $73,170.36 payment to be classified as pension-eligible wages because the agreement itself does not address pension eligibility. The City also argued that the Act does not require that payment to be pension eligible because "Compensation" under the Act excludes settlement or severance payments on the ground that they're not "for services performed as an employee of the Charlotte Fire Department." J.A. 380–81 (emphasis and quotation omitted). And, like in its response to Patterson's motion, the City noted that its dispute with Smith-Phifer required the district court to hold an evidentiary hearing.

### 4.    The District Court's Order

The district court declined to hold an evidentiary hearing on either Patterson or Smith-Phifer's motion. Rather, it summarily granted both motions on August 30, 2023. *Smith-Phifer v. City of Charlotte*, No. 18-CV-00612, 2023 WL 5620752, at *5 (W.D.N.C. Aug. 30, 2023).

The district court first found that both Patterson and Smith-Phifer reached complete settlement agreements with the City. *Id.* at *2. As for Smith-Phifer, the district court pointed to the two executed releases, the parties' representation to the district court that they reached an agreement, and the fact that the parties began performance under the

---

[8] She also requested, "if the corrected payment occurs after January 1, 2023, that the Court require Defendant to instruct the Charlotte Firefighters' Retirement System to make all necessary recalculations and pay any back benefits due to Plaintiff Smith-Phifer to comply with the Act." J.A. 210.

agreement. *Id.* As for Patterson, the district court found that "the email correspondence makes clear that the Parties reached a complete agreement." *Id.* The City, according to the district court, "accept[ed] by email but provided additional terms." *Id.* Then—although not citing particular language from the emails—the district court stated that "Patterson's counsel accepted the counteroffered terms." *Id*.

Next, the district court found that it could determine the terms of both complete agreements. Of note, it determined that the agreements required that the City's $73,170.06 payment to Smith-Phifer and its $79,000 payment to Patterson be pension-eligible wages. *Id.* at *3.

To reach that conclusion, the district court had to take various steps. First, the district court noted that, while the settlement agreement expressly labeled other payments as "not payment for wages," the Term 1(b) payment made directly to Smith-Phifer included no such caveat. *Id.* at *2. Instead, Term 1(b) required the City to make "all applicable deductions" and "issue Smith-Phifer a tax form W-2." *Id.*[9] Second, the district court found that those contractual terms meant that the payments made directly to Patterson and Smith-Phifer were "wages." *Id.* at *3. Third, by comparing the *Black's Law Dictionary*'s definition of "wage" and Act's definition of "Compensation," the district court determined

---

[9] Though the district court largely based its analysis on the text of Smith-Phifer's written agreements, it concluded that Patterson's payment should be treated identically because "Plaintiff Patterson and the City similarly agreed by email that the City would pay . . . $79,000 to Patterson 'through payroll,' and, as noted, under the same or very similar terms as Smith-Phifer's settlement agreement." *Smith-Phifer*, 2023 WL 5620752, at *2.

that "these definitions together" show that "wages fall under the definition of compensation under the Act." *Id.* at *3–4.

In the end, the district court granted both motions to enforce the settlement agreements. After the district court entered judgment, the City appealed.

## II.      Discussion

The City argues that the district court's order was erroneous for three reasons: (1) the district court was required to hold evidentiary hearings on both motions; (2) Patterson and the City never reached a complete agreement; and (3) the terms of Smith-Phifer's complete agreement did not require the City to classify its payment to her as pension-eligible wages. We agree with the City that an evidentiary hearing was required to determine whether it and Patterson reached a complete agreement. But, for Smith-Phifer, we hold that no evidentiary hearing was required and that the City breached its agreement.

"[D]istrict courts have inherent authority, deriving from their equity power, to enforce settlement agreements." *Hensley*, 277 F.3d at 540. Yet they can only *enforce* an agreement that the parties reach—they cannot make an agreement anew. In other words, their inherent authority depends on there being a complete settlement agreement. *Id*.; *Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983). That, in turn, requires "a meeting of the parties' minds." *Ozyagcilar*, 701 F.2d at 308. So to grant a motion to enforce a settlement agreement, "a district court (1) must find that the parties reached a complete agreement and (2) must be able to determine its terms and conditions." *Hensley*, 277 F.3d at 540–41. A district court's determination that the parties reached a *partial* settlement

15

agreement won't cut it; if the parties didn't have a meeting of the minds on all the material terms of the agreement, "any partial performance of the settlement agreement must be rescinded and the case restored to the docket for trial." *Ozyagcilar*, 701 F.2d at 308; *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins.*, 203 F.3d 291, 299 (4th Cir. 2000).

Given the prerequisites for granting a motion to enforce, a district court cannot always grant it summarily. It can only do so when the parties have reached a complete agreement, the district court can determine that agreement's material terms, and "the excuse for nonperformance of the agreement is 'comparatively insubstantial.'" *Hensley*, 277 F.3d at 540 (quoting *Millner v. Norfolk & W. Ry. Co.*, 643 F.2d 1005, 1009 (4th Cir. 1981)). Accordingly, "[i]f there is a factual dispute over the existence of an agreement, over the authority of attorneys to enter into the agreement, or over the agreement's terms," a district court "must conduct a plenary evidentiary hearing in order to resolve that dispute, and make findings on the issues in dispute." *Id*. (internal footnote and quotation omitted).[10]

---

[10] The City and Plaintiffs submit that North Carolina law governs the questions of whether a settlement agreement was reached and what the terms of that agreement mean. But questions of settlement-agreement enforceability are governed by federal common law, not state law. *Gamewell Mfg. v. HVAC Supply*, 715 F.2d 112, 115–16 & n.9 (4th Cir. 1983). And whether a complete settlement agreement was reached is a question of enforceability because it "implicate[s] federal procedural interests" in settling rather than litigating suits, making it "distinct from the underlying substantive interests of the parties." *Id*. at 115. So our cases apply federal common law derived from general contract principles in our discussion of agreement formation. *See id*. at 116 (deriving federal common law from the *Restatement of Contracts*); *cf. FDIC v. Jones*, 846 F.2d 221, 232 n.10 (4th Cir. 1988).

That said, we conclude that North Carolina law governs the interpretation of the agreement's terms because, no matter which law would apply in the abstract, both North Carolina and federal common law recognize choice of law provisions. *See Arnone v. Aetna Life Ins.*, 860 F.3d 97, 108 (2d Cir. 2017) (federal law); *Park v. Merrill Lynch*, 582 S.E.2d (Continued)

16

We review a district court's "decision whether to enforce a settlement agreement for abuse of discretion." *Hensley*, 277 F.3d at 541. Whether parties reached a settlement agreement is a question of fact we review for clear error. *See Moore v. Beaufort County*, 936 F.2d 159, 162 (4th Cir. 1991). But the interpretation of the meaning of a term in a settlement agreement "is a question of law that we review *de novo*." *DeLoach v. Lorillard Tobacco Co*., 391 F.3d 551, 562 (4th Cir. 2004).

### A.  Disputes Over the Existence of an Agreement Between the City and Patterson Require a Hearing

Patterson contended below, and insists on appeal, that the parties reached a complete settlement agreement on November 23, 2022, when the mediator sent his email and the parties responded. In contrast, the City maintains that the parties never reached a complete agreement; the agreement referenced by the mediator was merely an unenforceable preliminary agreement; and the email exchange that followed constituted multiple offers and counteroffers on material terms, none of which were ever accepted. Whether acceptance occurred and an enforceable agreement was reached are questions of fact. *See Charbonnages de France v. Smith*, 597 F.2d 406, 415–16 (4th Cir. 1979).

Here, the parties' "factual dispute over the existence of an agreement" required the district court to hold an evidentiary hearing. *Hensley*, 277 F.3d at 541. Indeed, the parties' dispute closely mirrors that in *Hensley v. Alcon Laboratories*. As here, the parties in *Hensley* came to a tentative agreement on the amount the defendant would pay the plaintiff

---

375, 378 (N.C. Ct. App. 2003) (North Carolina law). And Smith-Phifer's agreement—which, as we explain *infra*, is an existing settlement agreement—states that North Carolina law governs.

17

to settle his case.[11] *Id*. at 538.  And, as here, the parties later reached an impasse when they tried to put the tentative agreement into writing, so nothing was ever signed.  *Id*.  The defendant then moved to enforce the terms of the tentative agreement and the plaintiff responded by arguing that no final agreement was ever reached.  *See id*. at 538–39.  When the district court granted the defendant's motion without a hearing, we reversed.  *Id*.  Because the parties disagreed about whether an agreement existed or what its terms were, and because the relevant evidence was "ambiguous," "the district court was required to hold a plenary evidentiary hearing" "[t]o resolve these factual questions."  *Id*. at 541–42.

Here too we have a dispute over the existence of an agreement and ambiguous evidence to resolve it.  Even putting the question of pension eligibility aside, there are ample material factual issues unresolvable on the evidence presented in the parties' briefing.  For example, did the terms communicated by the mediator constitute a binding contract?  Or instead did one or both parties understand that there would be no enforceable agreement until one was reduced to a final writing and executed?  The evidence is unclear.  On one hand, the mediator's email doesn't say anything about a written agreement.  On the other hand, the parties' later communications to each other and to the district court show they were at least intending to reduce the agreement to writing, and the draft agreement the parties exchanged contained a term stating that the City wouldn't be obligated to perform

---

[11] Patterson's case isn't a precise mirror image of *Hensley*.  The parties in *Hensley* reached their tentative agreement during a settlement conference with the district judge rather than with a mediator.  277 F.3d at 538.  This shows that a district court may not summarily enforce a purported settlement agreement just because the parties told it they reached a tentative agreement—even if that tentative agreement was reached in the presence of the district court.

18

unless the written agreement was executed. These pieces of evidence leave an unresolved factual question: whether, during their negotiations with the mediator, either party demonstrated an intention to be bound only by a written agreement. And if either party *did*, that fact has the legal consequence that there was no contract.[12]

And even if the parties reached agreement about *some* terms, there remains a factual dispute about whether the parties ever agreed on the sick-leave-hours term. The mediator's email said the parties agreed that "Patterson [would be] provided 2,200 hours sick leave to bridge him to 25 years for retirement." J.A. 139. But the following exchanges indicate that the parties may have ascribed different meanings to that term. The Act provides that someone Patterson's age needs twenty-five years of qualifying service at the time of his retirement in order to receive retirement benefits. Act of Apr. 16, 2001, No. 22, sec. 1, § 15(1)(b), 2001 N.C. Sess. Laws, at 44. The City's emails indicate it believed the parties' intention was not to obligate the City to provide Patterson with 2,200 hours sick leave full-stop but rather to obligate the City to provide Patterson with whatever amount of sick leave he needed to get him to twenty-five years of service *at the time he actually retired*. Patterson, in contrast, appears to have thought the parties intended the term to mean the City would have to provide him 2,200 hours of sick leave *no matter when he actually*

---

[12] *See Restatement (Second) of Contracts* § 27 cmt. b (Am. L. Inst. 1981) ("[I]f either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract."); 1 *Corbin on Contracts* § 2.9 (rev. ed. 2024) ("If a party makes clear during negotiations that there will not be a legally operative contract unless and until the parties execute a more formal memorialization . . . there is no contract absent execution of a more formal document.").

19

*retired*. Without mutual assent about this term, the parties had no contract. *See Restatement (Second) of Contracts* § 17 (explaining that parties only form an enforceable contract when they mutually assent to all material terms of the agreement); *Quint v. A.E. Staley Mfg. Co.*, 246 F.3d 11, 14–15 (1st Cir. 2001). Nowhere in the email exchange or in the draft agreements is it clear that the parties' minds met on this essential term, so the evidence does not permit summarily concluding that they formed an enforceable contract. *Cf. Charbonnages de France*, 597 F.2d at 415–16.

In sum, the City and Patterson dispute whether a final agreement was reached. And that factual question turns on other facts that are far from clear based on the evidence the parties presented. It was thus "error for the district court to attempt to resolve th[e] question based solely on affidavits and briefs." *Ozyagcilar*, 701 F.2d at 308 n.*. Instead, the district court needed to hold a hearing. So we vacate its order granting Patterson's motion and remand for it to do so. *Id.* at 308; *Hensley*, 277 F.3d at 541–42.

## B.    Smith-Phifer's Agreement with the City

Unlike in opposition to Patterson's motion, the City hasn't argued that it didn't reach a complete agreement with Smith-Phifer. And it would be hard for it to do so—the parties' mutual assent to be bound was evinced by the two executed releases and by their performance thereunder, namely the City's payment to Smith-Phifer and Smith-Phifer's retirement. *See Jones*, 846 F.2d at 232 n.10 ("Performance completes a contract and operates as an assent.").

Rather, what the City and Smith-Phifer disagreed about below, and what they continue to disagree about here, is whether the City breached the contract that both parties

20

concede exists. Smith-Phifer says that it did, because the contract required it to not only pay her but also *treat* that payment as pension-eligible wages. The City disagrees, arguing first that it was entitled to a *Hensley* hearing on the question and second that the payment was not pension eligible.

Smith-Phifer is right that the City breached the contract, but both parties' focus on pension eligibility is slightly misplaced. This breach-of-contract dispute turns not on pension eligibility but on what, if anything, the City had to *do* under the contract other than simply pay Smith-Phifer. The answer lies within the agreement. The relevant section is Term 1(b), which requires the City to do three things: (1) issue a check to Smith-Phifer, (2) withhold "all applicable deductions" from the amount owed, and (3) issue a form W-2. Two important observations about Term 1(b): First, it makes no mention of "pension eligibility." Second, it *does* require the City to do something other than pay. In addition to paying, the City must withhold "all applicable deductions" and issue a W-2. The W-2 isn't at issue here.

So the City breached Term 1(b) if it failed to make some "applicable deduction[]" from Smith-Phifer's payment. We hold that it did. But understanding why requires that we read the parties' agreement alongside the Act. As Smith-Phifer argues, the Act states that if a payment is "Compensation," the City must deduct 12.65% of that payment and put it into a pension fund. So we must answer two questions to decide whether the City breached: One, was the settlement payment "Compensation" within the meaning of the Act? And two, if it was, was the required deduction "applicable" within the meaning of the agreement? The answer to both questions is "yes." Accordingly, we conclude that the

21

City breached by failing to make an applicable deduction.  For that reason, the district court rightly granted Smith-Phifer's motion to enforce.

### 1.      The Meaning of Smith-Phifer's Agreement

Start with the City's first argument:  that an evidentiary hearing was required under *Hensley* to sort out the parties' disagreement.  The City is mistaken.  This contract-interpretation dispute does not require an evidentiary hearing.  Determining the meaning of a contract term is familiar work for courts.  "In construing contracts[,] ordinary words are given their ordinary meaning." *Harris v. Latta*, 259 S.E.2d 239, 241 (N.C. 1979).  We only depart from ordinary meaning where a contract defines a term or where "the context clearly indicates another meaning was intended." *Singleton v. Haywood Elec. Membership Corp.*, 588 S.E.2d 871, 875 (N.C. 2003) (quotation omitted).  Whether a contract term is ambiguous or unambiguous in its context is a question of law to be decided by this Court on review *de novo*. *Morrell v. Hardin Creek, Inc.*, 821 S.E.2d 360, 366 (N.C. 2018).

We need not venture beyond ordinary meaning to find the unambiguous answer here.  The settlement agreement does not define the phrase "all applicable deductions," nor does context clearly indicate that the phrase is intended as a piece of party-specific jargon.  And neither party has argued that we should give any special meaning to "all applicable deductions."  With no reason to think otherwise, the ordinary meaning of the ordinary phrase "applicable deductions" controls. *See Ransom v. FIA Card Servs.*, 562 U.S. 61, 69 (2011) ("Because the Code does not define 'applicable,' we look to the ordinary meaning of the term.").

22

The ordinary meaning of "applicable" is "fit, suitable, or right to be applied." *Id.*; *see also Webster's Third New International Dictionary* 105 (2002); *Applicable*, *Black's Law Dictionary* (6th ed. 1990). It is not difficult to see that those deductions that legally *must* be applied are "fit and right to be applied" and are therefore included as "applicable deductions" that must be withheld under the settlement agreement. Indeed, if legally mandated deductions were not "applicable," it's unclear what deductions *would* be applicable. And since the settlement agreement requires "*all* applicable deductions," legally mandated deduction must be taken.

It is irrelevant that the parties may not have specifically and explicitly intended the payment to be subject to any particular legally mandated deduction. They need only have intended that the payment be subject to "all applicable deductions" as those words are ordinarily used. That the parties did not hold in their minds the full list of all the particular deductions mandated by law at the time of the settlement agreement does not constrain the ordinary meaning of "applicable deductions." *See Restatement (Second) of Contracts* § 5(2) ("A term of a contract is that portion of the legal relations resulting from the promise . . . whether or not the parties manifest an intention to create those relations."); *see also Morrell*, 821 S.E.2d at 368 (a "plain reading" of the phrase "all claims and liabilities" includes negligence claims even though negligence was not mentioned in the contract). And the ordinary meaning of "all applicable deductions" is unambiguous in including all deductions mandated by law.

Because we can determine the meaning of all material terms in the settlement agreement between Smith-Phifer and the City, no evidentiary hearing is required.

23

### 2. Applicable Deductions Under the Charlotte Firefighters Retirement Systems Act

Now for the City's second argument:  it did not breach the agreement by not making the retirement deduction.  We disagree.  The agreement requires the City to make "all applicable deductions," and the Act commands that the City must make a retirement deduction on compensation.  As we find that the City's payment to Smith-Phifer was compensation under the Act, we agree with the district court that the City breached the agreement's mandate to subtract "all applicable deductions" from the check.

Our conclusion turns on how the Act classifies the payment.  The Act requires the City to deduct 12.65% of a firefighter employee's "Compensation" to place in the retirement system.  Act of Apr. 16, 2001, No. 22, sec. 1, § 24, 2001 N.C. Sess. Laws at 51.  So to determine whether the Act mandates a deduction from the City's check to Smith-Phifer, we must decide whether that payment is "Compensation."

#### a. "Compensation" includes settlement agreements made to approximate wage-like payments

As a refresher, the Act defines "Compensation" as "the remuneration reportable on Form W-2 earned by a Member for services performed as an employee of the Charlotte Fire Department."  Act of July 13, 2006, No. 117, sec. 1, 2006 N.C. Sess. Laws at 440.  At first blush, one might be tempted to say that this payment was not "Compensation" because a settlement payment is not made "for services performed as an employee of the Charlotte

24

Fire Department."   Caselaw interpreting nearly identical statutory language in similar contexts, however, persuades us to conclude otherwise.[13]

In *Social Security Board v. Nierotko*, 327 U.S. 358 (1946), the Supreme Court was asked to decide whether money received as back pay was considered "wages" under Title II of the Social Security Act. *Id.* at 359.  That Title governed federal old-age benefits and was meant "to provide funds through contributions by employer and employee for the decent support of elderly workmen who have ceased to labor." *Id.* at 364.  It defined "wages" as "all remuneration for" "any service . . . performed . . . by an employee for his employer." *Id.* at 362–63 (quoting Social Security Act of 1935, Pub. L. No. 74-271, § 210(a), (b), 49 Stat. 620, 625)  The Social Security Board had concluded that back pay, which is the amount a wrongfully terminated employee "would have earned with the employer but for the unlawful discharge . . . less any net earnings during the time between discharge and reinstatement," was not wages because the employee, during his period of wrongful termination, did not actually perform any services for his employer. *Id.* at 365. But the Supreme Court rejected that position, finding the Board's interpretation of "services" too "limited." *Id.*  Instead, the Court concluded that the "words 'any service . . . performed . . . for his employer' . . . import breadth of coverage.  They admonish us against holding that 'service' can only be productive activity." *Id.* (first two alterations in original). To that end, the Court interpreted "service" to mean "not only work actually done but *the entire employer-employee relationship* for which compensation is paid to the employee by

---

[13] We see no reason to believe that North Carolina courts would not interpret this language in the same manner as federal courts have.

the employer." *Id.* at 365–66. Thus, under *Nierotko*, payments for back pay are "remuneration for" "any service . . . performed . . . by an employee for his employer."

The Court reached a similar conclusion about severance pay in *United States v. Quality Stores, Inc.*, 572 U.S. 141 (2014). Relying on *Nierotko*, the Court found that severance pay was a part of an employee's "wages." *Id.* at 146. Because "[s]everance payments are made to employees only," such payments stem directly from the employment relationship. *Id.* So, the Court concluded, "[s]everance payments are made in consideration for . . . a 'service . . . performed' by 'an employee for the person employing him.'" *Id.* (second alteration original) (quoting I.R.C. § 3121(b)).

Settlement agreements meant to approximate wage-like payments such as back pay and severance are also considered "remuneration for" "any service . . . performed . . . by an employee for [his employer]," as this Court held in *Hemelt v. United States*, 122 F.3d 204, 209 (4th Cir. 1997). There, the plaintiffs sought a refund for FICA taxes they had paid on a settlement payment. *Id.* at 205. Central to their argument was the claim that the settlement award did not constitute "wages" under the Internal Revenue Code.[14] *Id.* at 209. We disagreed. *Id.* After quoting *Nierotko*'s language that "service" refers to "the entire employer-employee relationship," *id.* (quoting *Nierotko*, 327 U.S. at 366), we pointed out that the claims that had led to the settlement—unlawful termination claims under § 502 of the Employee Retirement Income Security Act of 1974 ("ERISA")—"related directly to

---

[14] In *Hemelt*, "wages" was defined as "all remuneration for" "any service, of whatever nature, performed (A) by an employee for the person employing him." 122 F.3d at 209 (quoting I.R.C. § 3121(a), (b)).

26

taxpayers' employment relationship with" their employer. *Id.* Additionally, because the claims the employees released under the settlement could only have resulted in "recovery for lost wages and other economic harms," as opposed to "tort-like damages," payments made under the settlement retained that same character. *Id.*

Under *Norietko*, *Quality Stores*, and *Hemelt*, therefore, payments made under a settlement agreement that releases an employer from claims that arose from the employee's employment relationship with her employer and that approximate recovery for lost wages and other economic, nonpersonal harms are "wages" under Federal tax law. Notably, the definition of "wages" in those cases was "remuneration for" "any service . . . performed . . . by an employee for his employer." That is strikingly similar to the Act's definition of "Compensation," which is "remuneration . . . for services performed as an employee of the Charlotte Fire Department." *See* Act of July 13, 2006, No. 117, sec. 1, § 2(9), 2006 N.C. Sess. Laws at 440. So to determine whether the settlement payment was "Compensation" under the act, it suffices to determine whether the settlement payment to Smith-Phifer was "wages" under existing caselaw.

**b. This settlement-agreement payment to Smith-Phifer approximated wage-like pay**

Two inquiries guide whether a payment under a settlement agreement was meant to approximate recovery for lost wages and other economic, nonpersonal harms, rather than personal harms such as emotional distress. First, we consider "the nature of the claim that led to the settlement, together with the remedies available under the law on which the claim giving rise to the settlement is based." *Gerstenbluth v. Credit Suisse Sec. (USA) LLC*, 728

27

F.3d 139, 144 (2d Cir. 2013); *see also Comm'r v. Miller*, 914 F.2d 586, 589 (4th Cir. 1990) ("[T]he nature of the cause of action and the injury to be remedied must be identified." (quoting *Thompson v. Comm'r*, 866 F.2d 709, 711 (4th Cir. 1989)). Second, we consider "the intentions of *both* parties to the settlement, and in particular the purpose of the payor, as reflected in any written settlement agreement or other evidence." *Gerstenbluth*, 728 F.3d at 144. At bottom, both inquiries ask what the "'basic reason' for the payment" was. *Id.* at 145. The basic reason for the payment is a finding of fact that we review for clear error. *See Hensley*, 277 F.3d at 541; *Green v. Comm'r*, 507 F.3d 857, 866–68 (5th Cir. 2007).

When a plaintiff settles claims that provide only certain forms of relief, the first inquiry into the nature of the claims and their remedies can be dispositive. In *Hemelt*, for example, the plaintiffs sued under ERISA, which categorically barred "'extracontractual' or tort-like damages." 122 F.3d at 209. Instead, it only permitted "recovery for lost wages and other economic harms." *Id.* So, even though the plaintiffs attempted to characterize their settlement payment as "damages for emotional distress" based on the parties' "belie[f] . . . that the Settlement Plan would award personal injury damages to compensate for the plaintiffs' anxiety and emotional distress," we rejected that characterization because the claims the settlement resolved would not support such damages. *Id.* at 208, 210.

In this case, we lack the clarity we found in *Hemelt*. Smith-Phifer brought four claims that she eventually settled: one claim under Title VII of the Civil Rights Act of 1964, one claim under 42 U.S.C. § 1981, one claim under 42 U.S.C. § 1983, and one claim directly under the North Carolina Constitution. As for the first, Title VII authorizes

28

"compensatory and punitive damages," plus "such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate." 42 U.S.C. §§ 1981a(a)(1); 2000e-5(e)(B), (g)(1).   As for § 1983,[15] the statute broadly permits remedies available through "action[s] at law, suit[s] in equity, or other proper proceeding[s] for redress."   And when plaintiffs can bring actions directly under the North Carolina Constitution, state courts have broad remedial powers to provide "for adequate redress of such grievance." *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 289 (N.C. 1992) (quoting *Midgett v. N.C. State Highway Comm'n*, 132 S.E.2d 599, 608 (N.C. 1963)). Taken together, the claims Smith-Phifer brought are not limited in their remedies to damages that approximate recovery for lost wages and other economic, nonpersonal harms. So settlement payments for those claims cannot be categorically treated either. *Cf. Hemelt*, 122 F.3d at 209–10.

Accordingly, we turn to the second inquiry, which looks at what the parties, and particularly the payor, intended the payment to be for. *Gerstenbluth*, 728 F.3d at 144–45. The parties' purpose can be ascertained from the written settlement agreement itself, as well as any other evidence that is relevant. *Id.*  Taking all facts into consideration, the trial

---

[15] Which encompasses the § 1981 claim, as the City is a state actor. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731–32 (1989).

court must characterize the payment and, if relevant, allocate the various portions of settlement agreement to the various types of relief.[16] *See Miller*, 914 F.2d at 592.

We conclude that the district court, though it might not have used these precise terms, did not clearly err in finding that the entire Term 1(b) payment was meant to reflect compensation for economic harms—like back pay and severance pay—when it found that the settlement payment constituted "wages." When the parties intended for payments to be paid for different purposes, the agreement made that clear. Remember, the City issued three checks pursuant to its agreement with Smith-Phifer, each governed by a separate contractual term. The first two were made payable to "Maloney Law & Associates, PLLC," were specifically regarded as "not payment for wages," and were to be "reported on an IRS Form 1099 to Smith-Phifer and Maloney Law & Associates." J.A. 212, 219. And as the agreement clarifies, such payments make sense because the City was also settling Smith-Phifer's claims for attorneys' fees.

The Term 1(b) payment, on the other hand, was made in one check to Smith-Phifer directly, did not include the "not payment for wages" caveat, and was to be reported on a W-2. J.A. 219. Taken together, those facts suggest that the Term 1(a) payments and the

---

[16] Settlement payments, for tax purposes or otherwise, need not be treated as unitary wholes. *See, e.g.*, *Miller*, 914 F.2d at 587, 592 (noting that a single settlement payment of $900,000 that "did not provide for any allocation of the settlement proceeds between . . . the claims for compensatory damages and the claims for punitive damages" must still be divided, for tax purposes, to determine which part was and was not income). Instead, courts must evaluate the payment, both as a whole and as the sum of its constituent parts, "to ascertain what the payment fairly represents." *Gerstenbluth*, 728 F.3d at 144. As we see below, however, this Term 1(b) payment is for one purpose, and no subdivision is necessary.

Term 1(b) payment were different kinds of payments made for different reasons. And as the district court identified, the absence of the "not payment for wages" caveat in Term 1(b) implies that the "basic reason" of term was to pay Smith-Phifer "wages." *See* Expressio Unius Est Exclusio Alterius, *Black's Law Dictionary* (12th ed. 2024).

Additionally, if the payment were meant to provide Smith-Phifer with more than simply economic remedies and included personal and tort-like damages, then one would not issue Smith-Phifer a W-2 for that entire payment. In the "Damages" portion of her complaint, for example, Smith-Phifer specifically requested, *inter alia*, "damages for emotional distress." J.A. 115. But such damages are *not* reported on a W-2; they are reported on Box 3 of IRS Form 1099. Dep't of the Treas., *Instructions for Forms 1099-MISC and 1099-NEC* 5 (2024). Instead, W-2s generally report "wages." Dep't of the Treas., *General Instructions for Forms W-2 and W-3*, at 18 (2024).[17] Accordingly, by treating the Term 1(b) payment as a unified whole reportable on a W-2, and by contrasting that payment with the non-wage payments under Term 1(a) reportable on a 1099, the agreement itself suggests that parties intended the entirety of the Term 1(b) payment to compensate Smith-Phifer for her asserted economic, nonpersonal injuries.[18]

---

[17] Though some exceptions exist, the parties have not suggested any exception that would apply here.

[18] Granted, the ultimate touchstone for whether the payment is wages is the actual purpose of the payment, not the parties' characterization of the payment. The purpose of the payment must be compensation for economic harms, such as severance or back pay; simply labelling the payment as wages is not sufficient. *Cf. Greer v. United States*, 207 F.3d 322, 326–27 (6th Cir. 2000) (explaining that parties cannot avoid income taxes on settlement payments simply by characterizing the payment as being for personal injury). (Continued)

31

Outside the agreement itself, the actions of the City bolster this conclusion. Though Smith-Phifer took umbrage with the fact that the City classified her payment as "Severance Pay" instead of wages, J.A. 225, that umbrage is misplaced. As the Supreme Court has held, severance pay *is* a form of wages. *Quality Stores, Inc.*, 572 U.S. at 146. Thus, though indirectly, the City itself admitted through its performance that the settlement payment was meant to provide "wages."[19]

So, to sum up, the Term 1(b) payment appears to have been meant to compensate Smith-Phifer for alleged economic harms by giving her "wages," *i.e.*, back pay and severance. By giving her wages, the City gave her remuneration for services performed as an employee. That, in turns, means that the payment was "Compensation" under the Act. The City is mandated by law under the Act to make retirement deductions for all "Compensation." So the retirement deduction was an "applicable deduction" that the City promised to make when it signed the settlement agreement. And because the City did not do so, it breached the agreement, and the district court was right to grant Smith-Phifer's motion insofar as it asked the City to reissue her a check that complied with that obligation.

The City does not point to other evidence in the record that the payments were for nonwage damages, such as emotional distress. Instead, it resists this conclusion in two

---

In this case, however, there is no sign that the parties' characterization was different from the actual purpose of the payment.

[19] For these reasons, we disagree with Smith-Phifer that the City also breached the agreement by classifying the payment on the check as "Severance Pay" instead of "wages." Because severance pay is a form of wages, the City's severance check complied with its obligation to issue Smith-Phifer "wages."

ways. First, it argues that it was not required to treat its payment to Smith-Phifer as pension eligible—*i.e.*, make the retirement deduction—because the payment was not "*intended* to be pension eligible compensation." Opening Br. at 29 (emphasis added). Second, it argues that, even if the Act does apply, this payment is not "Compensation."

As support for its first argument, the City points toward a list of out-of-circuit authority holding that certain settlement payments were not pension eligible when the contracting parties "fail[ed] to make any reference in the [settlement agreement] to pension rights." *Id.* at 27 (quoting *Licciardi v. Kropp Forge Div. Emps' Ret. Plan*, 990 F.2d 979, 983 (7th Cir. 1993)). So, according to the City, by failing to specifically mention pension benefits, the agreement doesn't require the City to treat the payment as pension eligible, and Smith-Phifer's current motion is merely an attempt to change the terms of the deal *ex post*.

In reality, however, it is the City, not Smith-Phifer, who is attempting to alter the terms of the agreement. The language of the contract requires the City to make "all applicable deductions." As explained above, the retirement deduction is "applicable" if, under the Act, the City would be required by law to make that deduction from this payment. That question is answered by determining the purpose of the payment, *e.g.*, back pay for lost wages or damages for emotional distress. And again, as explained above, it matters not whether the parties explicitly intended the payment to be pension eligible.

The City's second argument is similarly unavailing. In arguing that the settlement payment to Smith-Phifer was not "for services performed as an employee of the Charlotte Fire Department," the City briefly attempts to distinguish cases like *Nierotko*. The City

33

claims that a more expansive view of "services performed" was appropriate in *Nierotko* because that case was interpreting the Internal Revenue Code, which is designed "to generate tax revenues for the United States," whereas the Act here has the more limited purpose of providing retirement benefits. Opening Br. at 31. Whatever force such an atextual argument might have in another case, it falls flat here for two reasons. First, *Nierotko* wasn't interpreting the tax code: It was interpreting Title II of the Social Security Act of 1935. 327 U.S. at 360. Second, the point of Title II, as the Supreme Court recognized, was "to provide funds . . . for the decent support of elderly workmen who have ceased to labor"—*i.e.*, retirement benefits. *Id.* at 364.

As a fallback, the City points out that the applicable definition of "wages" in *Nierotko* included the phrase "any service, *of whatever nature*, performed," while "Compensation" under the Act only covers "services performed." *Compare* Social Security Act of 1935, § 210(b), 49 Stat. at 625 (emphasis added), *with* Act of July 13, 2006, No. 117, sec. 1, § 2(9), 2006 N.C. Sess. Laws at 440. But the Supreme Court did not rest its interpretation in *Nierotko* on the phrase "of whatever nature." On the contrary, the Court *omitted* that phrase when doing its analysis. *See Nierotko*, 327 U.S. at 365 ("The very words 'any service . . . performed . . . for his employer,' with the purpose of the Social Security Act in mind import breadth of coverage." (alterations in original)). So the Court's conclusion was that the word "service" in the retirement-benefit context, in and of itself, must be interpreted expansively.

For these reasons, the district court did not clearly err when concluding that the City's payment to Smith-Phifer per the agreement's Term 1(b) was "Compensation" under

34

the Act.  By law, therefore, the City needed to make a retirement deduction.  Because it failed to do so, it breached the agreement.[20]

*   *   *

"[P]ublic policy wisely encourages settlements." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994).  Yet the cost savings and certainty that settlements provide litigants and the judicial system do not give district courts license to enforce nonexistent agreements.  Here, the district court jumped the gun by ruling, without an evidentiary hearing, on Patterson's motion to enforce a settlement agreement resolving his four-count complaint.  But it correctly enforced the City's agreement with Smith-Phifer, which was a

---

[20] One clarification of the district court's order is necessary.  We do not read the district court's order to grant Smith-Phifer's alternative request that the City "instruct the Charlotte Firefighters' Retirement System to make all necessary recalculations and pay any back benefits due to Plaintiff Smith-Phifer to comply with the Act."  J.A. 210.  And for good reason.  Under the Act, the City plays no primary role in the calculation of retirement benefits.  On the contrary, the Board of Trustees and the System's Administrator are in charge of the "administration and coordination of all System operations and activities." Act of Apr. 16, 2001, No. 22, sec. 1, §§ 27, 36(e), 2001 N.C. Sess. Laws at 52, 56; *see also id.* § 39, 2001 N.C. Sess. Laws at 57 (noting that the City may alter contributions but may not reduce benefits under the Act).  Further, such administration must be done in accordance with the Act, not the instructions of the City.  *Id.* § 36(e), 2001 N.C. Sess. Laws at 56.  So the relief Smith-Phifer sought here would essentially be a nullity.  But even if the City did have the power to bind the System or its agents, the agreement itself does not obligate the City to exercise that power.  As discussed above, all Term 1(b) required was the payment of a wage for a sum certain, minus "all applicable deductions," reported on a W-2.  J.A. 219.  While determination of whether a deduction must be made and the calculation of pension benefits are conceptually linked (in that they both are based on "Compensation"), the two are not directly tied together.  Instead, the calculation of benefits comes later in time and is not at all pegged to whether the City complied with its statutory obligations in making deductions; again, it is tied to "Compensation."  So the obligation to make a deduction does not include a concomitant obligation to recalculate benefits—at least by the terms of the settlement agreement.  If Smith-Phifer is unhappy with the System's calculations of her benefits (including the years in which the settlement payment is to be allocated), that should be taken up with the System, by litigation or otherwise.

complete agreement whose unambiguous terms required the City to make a deduction from the pension-eligible "Compensation" created by Term 1(b).  So we vacate and remand for further proceedings the district court's order granting Patterson's motion to enforce a settlement agreement.  On the other hand, we affirm the district court's order granting Smith-Phifer's motion.

*VACATED IN PART, AFFIRMED IN PART, AND REMANDED*